UNITED STATES DISTRICT COURT

DISTRICT OF NEVADA

\* \* \*

| WILLIAM BOLZ,<br><br>               Plaintiff,<br><br>    v.<br><br>CITY OF NORTH LAS VEGAS, a political subdivision of the State of Nevada; OFFICER SELWYN TALLY; OFFICER VITAL; NORTH LAS VEGAS CHIEF OF POLICE; and JOHN DOES I-X, inclusive,<br><br>               Defendants. | Case No. 2:12-cv-00288-RFB-PAL<br><br>**ORDER**<br><br>Defendants' Motion for Summary Judgment (ECF No. 39) |
|---|---|

## I.  INTRODUCTION

This matter is before the Court on a Motion for Summary Judgment filed by Defendants City of North Las Vegas ("North Las Vegas"), Officers Selwyn Talley and Manuel Vital, North Las Vegas Chief of Police Joseph Chronister, and numerous Doe defendants. ECF No. 39. In this case, Plaintiff William Bolz alleges that Defendants violated his Fourth and Fourteenth Amendment rights by arresting him without probable cause and causing him to be detained for approximately thirty hours until he was released on bail. For the reasons discussed below, the Court finds based upon the undisputed facts that the Defendant officers did not violate Bolz's constitutional rights and that even if they had, they would nonetheless be entitled to qualified immunity. Defendants' motion is therefore granted.

## II.  BACKGROUND

Based upon the evidence presented by both parties and the Court's preliminary findings of undisputed fact stated on the record at the hearing held on May 11, 2015, the Court finds the

following facts to be undisputed.

On August 5, 2010 at approximately 1:38 PM, Patricia Bolz (William Bolz's wife) placed a 911 call regarding her husband. Patricia told the 911 dispatcher that her husband was "suicidal right now" and that she "need[ed] someone to come." Tr. of 911 Call at 2:10-13, Mot. Summ. J. Ex. C. She then stated to the dispatcher that "earlier [William] had basically got in an argument with me, and then he choked me, and I told him I was leaving to go to my son's." Id. at 2:15-17. Patricia also gave her address to the dispatcher.

Defendants Selwyn Talley and Manuel Vital, officers employed by the North Las Vegas Police Department ("NLVPD"), were dispatched to respond to the call. Talley and Vital were informed by the NLVPD dispatcher that there was a possibly suicidal subject and that the subject's wife said that he choked her. Talley and Vital were also informed that William Bolz had left his home and was possibly on his way to the Veteran's Administration (VA) hospital to seek psychiatric treatment. At this point, Talley instructed NLVPD dispatch to ask Patricia Bolz to return to the house. He also instructed dispatch to call William and ask him to turn around and return to the house.

Patricia returned to the house first, at which point Officer Talley questioned her. During this questioning, Talley observed a scratch on the back of Patricia's hand or wrist. Patricia told Talley that she did not know where the scratch came from, but that it may have occurred during the altercation with her husband as she was moving her arms while telling him to get away from her. Talley did not observe any injuries to Patricia's neck or any signs of strangulation.

Patricia then wrote a witness statement in which she described the incident with her husband, William. In her written statement, Patricia stated that she and William were both in the computer room and that she told him she was going to San Diego to visit her niece. Patricia told her husband she was leaving because she needed to get away from him and their son Jeff, as the latter two individuals had been arguing and did not get along. According to Patricia:

> "Then William spun my computer chair around, put his hands on my chest area (upper) & he started pushing hard on it. I screamed & told him to get off of me & I tried to get up. He then grabbed me on my wrists keeping me in the chair. He finally snapped out of his rage & realized what he did.

- 2 -

> I went downstairs, he followed me & said he was sorry, he loved me with all his heart & he felt he 'lost it' & he needed & was going for help. I told him I was leaving the house & he said he was calling his Veteran's Admin Psychiatric doctor or going to check into a hospital. . . . I called 911 to send emergency medical because he threatened to harm himself after he realized what happened."

Witness Statement of Patricia Bolz, Mot. Summ. J. Ex. F.[1]

Talley also spoke to Nicholas Bolz, the couple's other son, who told Talley the following: Earlier that afternoon, Patricia called Nicholas. Patricia was crying and said that William had "lost it" and that he "grabbed her with rage in his eyes." Police Rep. at 4, Mot. Summ. J. Ex. A. William called Nicholas about twenty minutes later. William was also upset and told Nicholas that William had "lost his mind." Id. He then said "good bye," which Nicholas and his mother interpreted to mean that William may be planning to hurt himself. Patricia subsequently placed the 911 call.

Talley then spoke to William, who by that time had arrived on the scene and was in front of the house with Vital. William admitted that he confronted his wife about their son and placed his hands on her chest. William also completed a written statement at the request of Officer Vital. William was not read his Miranda rights prior to completing the statement or at any time thereafter. Paramedics arrived on the scene and checked William's vital signs, which were normal. Talley asked William if he wanted to harm himself, to which he responded no. William stated that he only wanted a psychiatric evaluation.

Officers Talley and Vital then placed William under arrest for domestic battery. Talley stated that he "determined that William was the primary physical aggressor in the domestic battery of Patricia" based on the physical injury to Patricia, her statements and her husband's statements corroborating that he had placed his hands on her chest. Police Rep. at 5. William was taken into custody and transported to North Las Vegas Detention Center, where he was detained for approximately thirty hours before being released on bail. While in jail, William was confined

---

[1] The Court considers the statements of Patricia and Nicholas Bolz not for their truth, but for the fact that they were made to the officers.

- 3 -

1   in a separate cell. The domestic battery charge was eventually dismissed with prejudice.

2   William Bolz filed his Complaint on February 22, 2012. ECF No. 1. On April 13, 2012,
3   the parties stipulated to the filing of an Amended Complaint. ECF No. 11. It does not appear that
4   this stipulation was ever approved by the Court; nonetheless, because the Amended Complaint
5   makes only minor corrections, the Court grants this stipulation and deems the First Amended
6   Complaint to be the operative Complaint in this matter.

7   William Bolz's First Amended Complaint lists five causes of action: (1) Violation of
8   constitutional rights under 42 U.S.C. § 1983; (2) Supervisory liability for violation of
9   constitutional rights; (3) a Monell claim against NLVPD for violation of constitutional rights; (4)
10  False arrest/false imprisonment; and (5) Intentional infliction of emotional distress.

11

12  **III.    LEGAL STANDARD**

13  Summary judgment is appropriate when the pleadings, depositions, answers to
14  interrogatories, and admissions on file, together with the affidavits, if any, show "that there is no
15  genuine dispute as to any material fact and the movant is entitled to judgment as a matter of
16  law." Fed. R. Civ. P. 56(a); accord Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986). When
17  considering the propriety of summary judgment, the court views all facts and draws all
18  inferences in the light most favorable to the nonmoving party. Johnson v. Poway Unified Sch.
19  Dist., 658 F.3d 954, 960 (9th Cir. 2011). Where the party seeking summary judgment does not
20  have the ultimate burden of persuasion at trial, it "has both the initial burden of production and
21  the ultimate burden of persuasion on a motion for summary judgment." Nissan Fire & Marine
22  Ins. Co., Ltd. v. Fritz Companies, Inc., 210 F.3d 1099, 1102 (9th Cir. 2000).

23  "In order to carry its [initial] burden of production, the moving party must either produce
24  evidence negating an essential element of the nonmoving party's claim or defense or show that
25  the nonmoving party does not have enough evidence of an essential element to carry its ultimate
26  burden of persuasion at trial." Id. If the movant fails to carry this burden of production, "the
27  nonmoving party has no obligation to produce anything, even if the nonmoving party would have
28  the ultimate burden of persuasion at trial." Id. at 1102-03. But if the moving party carries its

1  initial burden, "the nonmoving party must produce evidence to support its claim or defense." Id.
2  at 1103. In doing so, the nonmoving party "must do more than simply show that there is some
3  metaphysical doubt as to the material facts . . . . Where the record taken as a whole could not
4  lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial."
5  Scott v. Harris, 550 U.S. 372, 380 (2007) (alteration in original) (internal quotation marks
6  omitted). However, the ultimate burden of persuasion on a motion for summary judgment rests
7  with the moving party, who must convince the court that no genuine issue of material fact exists.
8  Nissan Fire, 210 F.3d at 1102.

## IV.   DISCUSSION

After reviewing the arguments and evidence in this case, the Court concludes that Defendants are entitled to summary judgment on all of Bolz's claims. Based upon the undisputed facts, Officers Talley and Vital did not use excessive force in arresting Bolz.[2] Talley and Vital also had probable cause to arrest Bolz and were not deliberately indifferent to his safety or medical needs. As a result, Bolz's Section 1983 claim against Talley and Vital cannot survive. Given these findings and that Bolz does not present any other evidence of an unconstitutional policy or intent to inflict severe emotional distress, summary judgment is also granted on Bolz's remaining claims.

### A.   Count One – Violation of Constitutional Rights

In his first claim Bolz alleges that Officers Talley and Vital violated his constitutional rights when they arrested him for domestic battery. This claim was brought under 42 U.S.C. § 1983. "To state a claim under Section 1983, [a plaintiff] must plead two essential elements: 1) that the Defendants acted under color of state law; and 2) that the Defendants caused them to be deprived of a right secured by the Constitution or laws of the United States." Johnson v. Knowles, 113 F.3d 1114, 1117 (9th Cir. 1997).

It is beyond question—and indeed neither party disputes—that Talley and Vital, as police

---

[2] For the remainder of this Order, unless otherwise specified, the Court uses the name "Bolz" to refer to Plaintiff William Bolz.

- 5 -

1  officers exercising the power given them by the state, were acting under color of state law when
2  they investigated Patricia Bolz's emergency call and arrested William Bolz. West v. Adkins, 487
3  U.S. 42, 49-50 (1988) ("[G]enerally, a public employee acts under color of state law while acting
4  in his official capacity or while exercising his responsibilities pursuant to state law."). Therefore,
5  the question before the Court is whether the officers' actions deprived Bolz of his constitutional
6  rights.

7  Bolz's Amended Complaint appears to allege three separate constitutional violations:
8  first, that Talley and Vital used excessive force by handcuffing him after they had placed him
9  under arrest; second, that Talley and Vital arrested him without probable cause; and third, that
10 Talley and Vital placed him in danger in deliberate indifference to his safety by calling him back
11 to his house and preventing him from seeking medical treatment at the VA hospital. Any of these
12 allegations, if proven, would violate Bolz's Fourth or Fourteenth Amendment rights. However,
13 the undisputed evidence shows that the officers did not violate Bolz's constitutional rights
14 through their use of handcuffs, their decision to arrest Bolz, or their decision to interrupt his
15 attempt to seek medical treatment.

16      1.    Excessive Force Allegation

17  Claims of excessive force arising in the context of an arrest or investigatory stop are
18 analyzed under the Fourth Amendment's "objective reasonableness" standard. Graham v.
19 Connor, 490 U.S. 386, 395-97 (1989). Under this standard, "the question is whether the officers'
20 actions are objectively reasonable in light of the facts and circumstances confronting them,
21 without regard to their underlying intent or motivation." Id. at 397 (internal quotation marks
22 omitted). In determining whether a particular use of force was unreasonable and thus in violation
23 of the Fourth Amendment, courts must balance "the nature and quality of the intrusion on the
24 individual's Fourth Amendment interests" against the government's countervailing interests. Id.

25  It is well established that tight handcuffing can constitute excessive force. LaLonde v.
26 Cnty. of Riverside, 204 F.3d 947, 960 (9th Cir. 2000) (citing cases). Additionally, "[t]he issue of
27 tight handcuffing is usually fact-specific and is likely to turn on the credibility of the witnesses."
28 Id. However, there is no allegation in this case that Bolz's handcuffs were too tight. Rather,

Bolz's allegation appears to be that the *fact* that he was handcuffed constituted excessive force. See Am. Compl. ¶ 19, ECF No. 11-1.

Bolz's deposition testimony belies any claim that the force used by the officers was excessive. Bolz testified that when he was told he was under arrest, Vital also told him that Vital "would wait until [transport officers] arrived to put the cuffs on to take me to jail." Dep. of William Bolz 97:15-16, Mot. Summ. J. Ex. H. When asked whether the officers used force that he considered excessive, Bolz answered: "No. They showed professional courtesy and waited for the van to come up. And Officer Vital walked me over, and the guy cuffed me, put me in the van and took me away." Id. at 133:10-13. Bolz has therefore produced no evidence to support his excessive force claim other than the fact that he was placed in handcuffs as he was transported to the detention center. Accordingly, the Court finds that the level of force used during Bolz's arrest was minimal. It is this level of force that must be balanced against the government's interests.

Turning to the government's interests, the Court finds that Defendants have a small yet significant interest at stake. "Factors [courts] consider in assessing the government interests at stake include (1) the severity of the crime at issue, (2) whether the suspect poses an immediate threat to the safety of the officers or others, and (3) whether [the suspect] is actively resisting arrest or attempting to evade arrest by flight." Davis v. City of Las Vegas, 478 F.3d 1048, 1054 (9th Cir. 2007) (quoting Graham, 490 U.S. at 396). "Courts may also consider the availability of alternative methods of capturing or subduing a suspect." Davis, 478 F.3d at 1054. Based on the undisputed evidence, the crime Bolz was suspected of committing—domestic battery—can undoubtedly constitute a serious offense in certain contexts.[3] However, it is clear from the record that Bolz did not present an immediate threat to anyone's safety at the time of his arrest, nor was he actively resisting or attempting to evade arrest. Bolz returned to his home at the request of the NLVPD dispatcher. He also willingly spoke to Vital and testified that he was in his front yard with Vital for fifteen to thirty minutes waiting for Talley to complete his investigation. There is

---

[3] The Court recognizes, however, that the Supreme Court of Nevada has concluded that first-offense domestic battery is not a "serious" offense within the meaning of the Sixth Amendment to the U.S. Constitution, and thus the right to jury trial does not attach to it. Amezcua v. Eighth Judicial Dist. Ct., 319 P.3d 602 (Nev. 2014).

1  no evidence before the Court that would suggest that Bolz in any way resisted arrest or attempted
2  to flee. Nonetheless, the government had an interest in using a small degree of force to carry out
3  the arrest. Graham, 490 U.S. at 396 ("Our Fourth Amendment jurisprudence has long recognized
4  that the right to make an arrest or investigatory stop necessarily carries with it the right to use
5  some degree of physical coercion or threat thereof to effect it.").

6  Balancing these competing interests, the Court finds based on the undisputed evidence
7  that Officers Talley and Vital's use of handcuffs during the arrest of Bolz was not objectively
8  unreasonable. This is finding is based particularly on Bolz's admission in his deposition that the
9  officers did not use excessive force and that they showed professional courtesy during the
10 investigation. It is also based on the complete lack of evidence in the record of any injuries to
11 Bolz as a result of the handcuffs or of any complaints by Bolz (either at the time or in his
12 deposition) about the tightness of, or any pain inflicted by, the handcuffs.

13 Even assuming that the officers' decision to use handcuffs was a violation of Bolz's
14 Fourth Amendment rights, Talley and Vital would still be entitled to qualified immunity. "The
15 doctrine of qualified immunity protects government officials from liability for civil damages
16 insofar as their conduct does not violate clearly established statutory or constitutional rights of
17 which a reasonable person would have known." Pearson v. Callahan, 555 U.S. 223, 231 (2009).
18 Qualified immunity is an immunity from suit rather than a defense to liability, and "ensures that
19 officers are on notice their conduct is unlawful before being subjected to suit." Tarabochia v.
20 Adkins, 766 F.3d 1115, 1121 (9th Cir. 2014). In deciding whether officers are entitled to
21 qualified immunity, courts consider, taking the facts in the light most favorable to the nonmoving
22 party, whether (1) the facts show that the officer's conduct violated a constitutional right, and (2)
23 if so, whether that right was clearly established at the time. Id. Under the second prong, courts
24 "consider whether a reasonable officer would have had fair notice that the action was unlawful."
25 Id. at 1125 (internal quotation marks omitted). The plaintiff bears the burden of proving that the
26 right was clearly established. Id. at 1125.

27 Here, Talley and Vital determined they had probable cause to arrest Bolz for domestic
28 battery. They did not place him in handcuffs immediately, but rather waited until the transport

1  van showed up. There is no evidence in the record that Bolz ever complained of the use of
2  handcuffs or asked that they be removed. Based upon these facts, it was not clearly established at
3  the time of Bolz's arrest that a police officer could not place an individual in handcuffs for
4  transport to a detention center after lawfully arresting the individual. Talley and Vital are
5  therefore entitled to qualified immunity on the excessive force claim.

6        2.      Arrest Without Probable Cause Allegation

7        "[A]n arrest without probable cause violates the fourth amendment and gives rise to a
8  claim for damages under [Section] 1983." Borunda v. Richmond, 885 F.2d 1384, 1391 (9th Cir.
9  1988). "Probable cause to arrest exists when officers have knowledge or reasonably trustworthy
10 information sufficient to lead a person of reasonable caution to believe that an offense has been
11 or is being committed by the person being arrested." Ramirez v. City of Buena Park, 560 F.3d
12 1012, 1023 (9th Cir. 2009) (internal quotation marks omitted). Probable cause does not require
13 evidence that is conclusive of guilt, but it does require "a fair probability, given the totality of the
14 evidence," that a suspect has committed a crime. Garcia v. Cnty. of Merced, 639 F.3d 1206,
15 1209 (9th Cir. 2011) (internal quotation marks omitted).

16       Here, Bolz was arrested for the crime of domestic battery. In Nevada, domestic battery
17 includes any battery committed against the person's spouse. Nev. Rev. Stat. § 33.018(1)(a). A
18 battery is defined as "any willful and unlawful use of force or violence upon the person of
19 another." Id. § 200.400(1)(a). Moreover, under Nevada law, the fact that a use of force did not
20 result in injury "is not relevant to the question of whether a battery occurred." Byars v. State, 336
21 P.3d 939, 949 (Nev. 2014) (quoting Hobbs v. State, 251 P.3d 177, 180 (Nev. 2011) ("[A]t a
22 minimum, battery is the intentional and unwanted exertion of force upon another, however
23 slight.")).

24       The Court finds that Talley and Vital had probable cause to arrest Bolz. Even when
25 construing the undisputed facts in the light most favorable to Bolz and resolving all factual
26 disputes in his favor, there was a fair probability that Bolz committed the crime of domestic
27 battery based upon the totality of the evidence and information known to the officers at the time.
28 The officers responded to a 911 call in which Patricia Bolz stated that William Bolz had

- 9 -

1  "choked" her. Officer Talley interviewed Patricia, who stated that Bolz placed his hands on her
2  upper chest and pushed hard and that when she tried to get up, he grabbed her wrists and held her
3  in the chair. Officer Talley observed a scratch on Patricia's hand or wrist, although Patricia told
4  Talley that she did not know how she got the scratch and that it may have occurred inadvertently.
5  Officer Talley also interviewed Nicholas Bolz, who stated that his mother called him and said
6  that Bolz had "grabbed her with rage in his eyes." These pieces of information, which were
7  known to the officers at the time, were sufficient to create probable cause to arrest.
8        Bolz argues that there is a genuine issue of material fact as to whether probable cause
9  existed because Patricia Bolz called 911 to request a health and wellness check on her husband,
10 not to report domestic battery. Talley did state at his deposition that he called Bolz back to the
11 house to investigate the report that Patricia had been choked as well as the report that Bolz was
12 potentially suicidal. Dep. of Selwyn Talley 42:22-25, 43:1-15, Mot. Summ. J. Ex. E ("Talley
13 Dep."). But Bolz has not identified, and the Court has not found, any authority stating that an
14 officer's determination of probable cause turns on the purpose of an emergency call, particularly
15 where (as here) it is undisputed that the caller also made statements during the call that would
16 warrant further investigation into whether a domestic battery occurred.
17       Bolz also contends that the statute directing peace officers to arrest a person when the
18 officer determines that probable cause for domestic battery exists specifically provides
19 exceptions for cases where mitigating circumstances exist, and that therefore a genuine issue of
20 material fact exists as to whether Talley and Vital should have arrested him.
21       The Court does not agree. Section 171.137 of the Nevada Revised Statutes states, in
22 relevant part: "Except [in cases involving mutual battery], whether or not a warrant has been
23 issued, a peace officer shall, unless mitigating circumstances exist, arrest a person when the
24 peace officer has probable cause to believe that the person to be arrested has, within the
25 preceding 24 hours, committed a battery upon his or her spouse . . . ." Nev. Rev. Stat. §
26 171.137(1). The Court will assume for the moment that "mitigating circumstances" existed here
27 given that Bolz was seeking psychiatric treatment and that his wife told the 911 dispatcher that
28 he was suicidal. This statute does not, as Bolz argues, mandate that officers refrain from making

1  an arrest based upon probable cause for domestic battery when mitigating circumstances exist.
2  Instead, by its plain language, the statute merely removes the *requirement* that officers make
3  such an arrest if mitigating circumstances are present. The fact that Talley and Vital nonetheless
4  chose to make such an arrest does not mean that they violated Section 171.137. It simply means
5  that they either determined that mitigating circumstances did not exist based upon their
6  examination and questioning of Bolz about whether he wanted to harm himself, or determined
7  that it was necessary to make an arrest regardless of the mitigating circumstances.[4]

8  While it may have been preferable from a policy standpoint to allow Bolz to receive
9  psychiatric treatment instead of having him return to the house and placing him under arrest, the
10 Court is aware of no authority that makes Talley and Vital's decision unlawful. It is not the
11 Court's role to determine whether as a policy matter the actions of the officers was appropriate;
12 rather, the Court must and does confine itself to the application of the established precedent as it
13 applies to the facts of this case. The officers therefore possessed probable cause to arrest Bolz
14 based on the facts known to them at the time. Their decision to do so did not violate Bolz's
15 Fourth Amendment rights.

16 Further, even if Talley and Vital had lacked probable cause, they are entitled to qualified
17 immunity because their decision to arrest Bolz did not violate a clearly established right. While it
18 is certainly "clearly established that an arrest without probable cause violates a person's Fourth
19 Amendment rights," Knox v. Southwest Airlines, 124 F.3d 1103, 1107 (9th Cir. 1997), officers
20 who "reasonably but mistakenly conclude that probable cause is present" are nonetheless entitled
21 to immunity, Hunter v. Bryant, 502 U.S. 224, 227 (1991). Based upon the information that was
22 undisputedly known to Talley and Vital at the time they arrested Bolz, and even without
23 considering Bolz's own statement to the officers, it was reasonable for the officers to believe that
24 they possessed probable cause that Bolz committed a willful and unlawful use of force against
25 Patricia and therefore could be arrested for domestic battery. Accordingly, Talley and Vital are

---

[4] Additionally, even if the Court were to find that N.R.S. § 171.137 were to no longer apply if mitigating circumstances were present, it is clear that Talley and Vital also would have had authority to arrest Bolz under the more general statute dictating when arrest may be made because the arrest was between the hours of 7 a.m. and 7 p.m. See N.R.S. § 171.136 ("If it is a misdemeanor, the arrest cannot be made between the hours of 7 p.m. and 7 a.m. . . .").

1   entitled to qualified immunity on the issue of probable cause to arrest.

2                           3.         Deliberate Indifference Allegation

3         "Although the 14th Amendment does not generally require police officers to provide medical assistance to private citizens, when a state officer's conduct places a person in peril in deliberate indifference to their safety, that conduct creates a constitutional claim." Penilla v. City of Huntington Park, 115 F.3d 707, 709 (9th Cir. 1997) (citation omitted). Such "danger creation" liability is recognized where state officials "creat[e] or expos[e] individuals to danger they otherwise would not have faced." Kennedy v. City of Ridgefield, 439 F.3d 1055, 1062 (9th Cir. 2006). To prevail under this theory, a plaintiff must show that the state officials (1) affirmatively placed an individual in danger (2) with deliberate indifference the individual's safety. Id. The "deliberate indifference" standard "requir[es] proof that a municipal actor disregarded a known or obvious consequences of his action." Bd. of Cnty. Comm'rs v. Brown, 520 U.S. 397, 410 (1997).

          The Amended Complaint alleges that Talley and Vital violated Bolz's Fourteenth Amendment rights by ordering him to return to his house when he was on his way to the VA hospital, thereby depriving him of the medical care he was seeking. Based on the undisputed facts, the Court finds that the officers did not violate Bolz's Fourteenth Amendment rights because, regardless of whether their decision to tell Bolz to return home affirmatively exposed him to danger, the officers did not act with deliberate indifference to Bolz's safety.

          In his deposition, Talley testified that, while he was aware that Bolz was reportedly seeking psychiatric treatment, he was concerned that Bolz may not actually follow through. Talley Dep. at 38:12-18. When asked why he would call a potentially suicidal individual back to their home when the individual was seeking medical treatment, Talley stated: "I didn't know for a fact that he was actually going to get medical help. You can say one thing and not follow through and continue on. . . . If I can get him back to where I am, I can orchestrate getting him before medical attention, which I did. Had medical respond to my location." Id. Talley called paramedics to come to the house to assist in determining whether Bolz needed emergency medical attention or psychiatric treatment and to transport him to the hospital if necessary. Talley

1    Dep. 38:16-23, 40:9-12, 78:1-25, 79:1-3. Bolz testified in his deposition that once he arrived at
2    the house, Talley immediately made sure Bolz wasn't carrying any weapons and informed him
3    that paramedics were "around the corner." Dep. of William Bolz 92:3-11, Mot. Summ. J. Ex. H.
4    The paramedics arrived, took Bolz's vital signs, and asked him several questions, including
5    whether he "felt like [he] might want to hurt [himself] or somebody else." Id. at 92:16-25. Talley
6    also asked Bolz whether he wanted to harm himself. Based on Bolz's response and on his
7    conversations with Patricia and Nicholas, Talley determined that there was nothing to
8    corroborate the possibility that Bolz wanted to harm himself. Talley Dep. at 52:2-25, 53:1-4.
9    Based upon these undisputed actions, Talley and Vital recognized the potential risk in asking the
10   dispatcher to have Bolz turn around before determining whether his condition was so severe that
11   they should have let him continue on to the hospital. However, Talley and Vital also recognized
12   the risk in *not* asking Bolz to return to the house and speak with them. They could not be sure
13   whether Bolz would actually go to the hospital or whether he might go somewhere else and
14   potentially harm himself or others. Talley and Vital determined that it was safer to ask him to
15   return to the house where they could speak with him in person and arrange medical treatment if
16   necessary, and took reasonable steps—ensuring that paramedics arrived on the scene to check
17   Bolz and transport him away if necessary, asking Bolz directly whether he wanted to harm
18   himself, and asking Patricia and Nicholas to provide specific information to support the
19   allegation that he was potentially suicidal—to address the risk that Bolz might harm himself.
20   Regardless of whether Talley and Vital chose the wisest course of action, they did not act with
21   deliberate indifference to Bolz's safety.
22           Talley and Vital are also entitled to qualified immunity on Bolz's deliberate indifference
23   claim. As discussed above, the officers reasonably determined that any danger they may have
24   created for Bolz was less than the danger of allowing him to continue driving. This was
25   supported by Talley's testimony that even though he had been informed that Bolz was on his way
26   to seek treatment, he was not certain that Bolz would actually do so. The officers also took
27   reasonable steps by arranging for paramedics to address any risk they may have created for Bolz
28   by asking him to return home. Based upon these facts, it was not clearly established at the time

of this incident that the officers' conduct violated Bolz's constitutional right to be free from state-created danger. The closest case to which Bolz could point as establishing this right, Penilla, is starkly different from this case. In Penilla, police officers responded to a 911 emergency medical call and found Mr. Penilla on the front porch of his home in critical need of medical care. 115 F.3d at 708. The officers cancelled the request for paramedics, broke the lock on Penilla's front door, moved him inside, locked the door, and left. Id. The next day, Penilla's relatives found him dead on the floor in his house; he had died from respiratory failure. Id. The Ninth Circuit held that the alleged conduct by the officers "clearly placed Penilla in a more dangerous position than the one in which they found him. . . . [B]y cancelling the 911 call, removing Penilla from public view, and locking the front door, the officers made it impossible for anyone to provide emergency medical care to Penilla." Id. at 710. Here, by contrast, Talley and Vital made sure that Bolz was seen by medical professionals when he arrived at the house and that he and his wife and son were questioned specifically on whether Bolz had given any indication that he wanted to harm himself. Even if the officers' actions were unlawful, a reasonable officer would not have known that they were. Neither Penilla nor any other case addressing the danger creation exception clearly establishes as much.

In sum, based on the undisputed evidence, summary judgment is granted in favor of Defendants on Count One of the Amended Complaint, and Officers Talley and Vital are entitled to qualified immunity on Bolz's excessive force, arrest without probable cause, and deliberate indifference claims.

### B.     Count Two – Supervisory Section 1983 Liability

In his second claim, Bolz alleges that Joseph Chronister, the North Las Vegas Chief of Police, is liable for the unconstitutional acts of Talley and Vital. This claim fails as a matter of law because the Court has found that Talley's and Vital's acts were not unconstitutional.

"Although there is no pure *respondeat superior* liability under section 1983, a supervisor is liable for the acts of his subordinates if the supervisor participated in or directed the violation, or knew of the violations of subordinates and failed to correct them." Preschooler II v. Clark

1  County School Bd. of Trustees, 479 F.3d 1175, 1182 (9th Cir. 2007) (internal quotation marks
2  omitted). "Neither a municipality nor a supervisor, however, can be held liable under § 1983
3  where no injury or constitutional violation has occurred." Jackson v. City of Bremerton, 268 F.3d
4  646, 653 (9th Cir. 2001).

5  Here, the Court has found based on the undisputed facts that Defendants Talley and Vital
6  did not violate Bolz's Fourth or Fourteenth Amendment rights. Therefore, as no constitutional
7  violation occurred, there is no basis upon which to find Chronister liable for the alleged use of
8  excessive force, arrest without probable cause, or deliberate indifference to Bolz's safety.
9  Summary judgment is granted in favor of Defendants on this claim.

### C.   Count Three – Monell Claim

Bolz also alleges that North Las Vegas is subject to municipal liability for the constitutional violations committed by Talley and Vital. Bolz argues that the alleged violations were committed pursuant to a policy or custom of North Las Vegas or that the violations were ratified by one with final policymaking authority.

Here, there is no basis for municipal liability because the Court has found that there was no violation of Bolz's constitutional rights. See Jackson, 268 F.3d at 653; Scott v. Henrich, 39 F.3d 912, 916 (9th Cir. 1994) ("While the liability of municipalities doesn't turn on the liability of individual officers, it is contingent on a violation of constitutional rights. Here, the municipal defendants cannot be held liable because no constitutional violation occurred."). Similarly, Bolz's claim that North Las Vegas failed to train its officers in Critical Incident Training must be rejected because Bolz has not shown that any constitutional violation has occurred. Long v. City & Cnty. of Honolulu, 511 F.3d 901, 907 (9th Cir. 2007) ("If there was no constitutional violation of [the plaintiff's] rights, there is no basis for finding the officers inadequately trained.") (internal quotation marks omitted). Summary judgment is granted in favor of Defendants on Bolz's Monell claim.

. . .

. . .

**D.     Count Four – False Arrest/False Imprisonment**

Bolz's fourth claim for relief, for false arrest and false imprisonment, also must be rejected because Talley and Vital's arrest of Bolz was lawful and done with probable cause. In order to establish false arrest under Nevada law, "a claimant must show that the actor instigated or effected an unlawful arrest." Jordan v. State ex rel. Dept. of Motor Vehicles & Pub. Safety, 110 P.3d 30, 48 (Nev. 2005), abrogated on other grounds by Buzz Stew, LLC v. City of North Las Vegas, 181 P.3d 670 (Nev. 2008). In addition, "[t]o establish false imprisonment of which false arrest is an integral part, it is necessary to prove that the person be restrained of his liberty under the probable imminence of force without any legal cause or justification." Hernandez v. City of Reno, 634 P.2d 668, 671 (Nev. 1981).

Based on the Court's findings above, Bolz cannot establish that Talley or Vital instigated an unlawful arrest or that Bolz was restrained of his liberty without legal justification. Therefore, summary judgment is granted in favor of Defendants on this claim.

**E.     Count Five – Intentional Infliction of Emotional Distress**

Finally, Bolz claims that Talley and Vital's actions of handcuffing and arresting him constitute intentional infliction of emotional distress (IIED).

Under Nevada law, a claim for intentional infliction of emotional distress requires: "(1) extreme and outrageous conduct with either the intention of, or reckless disregard for, causing emotional distress; (2) severe or extreme emotional distress suffered by the plaintiff; and (3) actual or proximate causation." Jordan, 110 P.3d at 52 (Nev. 2005). The plaintiff's complaint must also specifically allege intent. Id.

The Court's determinations that Talley and Vital did not use excessive force in handcuffing Bolz, that they had probable cause to arrest Bolz, and that they were not deliberately indifferent to Bolz's safety, along with its subsequent findings of qualified immunity on those claims, lead the Court to find that the officers' conduct was not "extreme and outrageous" under the circumstances. In addition, Bolz has presented no evidence that Talley and Vital's decision to arrest Bolz, their decision to place him in handcuffs, or their decision to have him return to the

house constituted extreme and outrageous conduct or that they did so with the intent to inflict severe emotional distress on Bolz. Summary judgment is therefore granted in favor of Defendants on this claim.

V. CONCLUSION

For the reasons stated above,

**IT IS ORDERED** that Defendants' Motion for Summary Judgment (ECF No. 39) is GRANTED. The Clerk of Court is instructed to enter judgment in favor of Defendants and close this case.

DATED: August 3, 2015.

_____
**RICHARD F. BOULWARE, II**
**United States District Judge**